IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| JOHN S. AVERY,<br><br>Plaintiff,<br><br>v.<br><br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 1:12-cv-007-RJS<br><br><br>Judge Robert J. Shelby |

Plaintiff John S. Avery, Jr. seeks judicial review of the decision of the Commissioner of

Social Security Administration denying Mr. Avery's application for Disability Insurance Benefits

(DIB).  After a careful review of the record and for the reasons discussed below, the court finds

that the administrative law judge (ALJ) committed no legal error and her conclusions were

supported by substantial evidence in the record.  The court therefore AFFIRMS the ALJ's

decision.

BACKGROUND

I.      **Procedural Background[1]**

In December 2008, Mr. Avery filed an application for Disability Insurance Benefits under

---

[1]  The court's review is limited to the record provided and the citations in this opinion are
to that record.

Title II of the Social Security Act.  (R. at 18.)  He claimed that, as of June 28, 2002, he was

disabled due a combination of impairments, including:  obesity; degenerative disc disease (post

fusion) – the wear changes in the individual discs of the spine after spine fusion; failed back

syndrome – chronic back and/or leg pain after back surgery; left wrist de Quervain's

tenosynovitis – inflammation of the tendons of the thumb that extend to the wrist; radial styloid

impingement – wrist pain; knee pain; sleep apnea; and headaches.  (R. at 18.)  The Social

Security Administration denied his claims on April 22, 2009, and again upon reconsideration on

November 18, 2009.  (R. at  54-59, 61-63.)  Mr. Avery then requested a hearing.  The hearing

was held on May 26, 2011 in front of administrative law judge (ALJ) Patricia E. Hartman.  (R. at

31.)  On June 6, 2011, Judge Hartman denied Mr. Avery's application.  (R. at  28.)  This appeal

followed.

## II.    Factual Background

Mr. Avery was 44 years old at the time of the ALJ's decision denying his claim for DIB.

The date before which Mr. Avery has to prove disability in order to be eligible for DIB was

March 31, 2004 (Mr. Avery's date of last insured).  (R. at 20.)  Mr. Avery's prior jobs included

work as a data entry clerk, a quality control inspector, and an admitting clerk at a hospital.  (R. at

199.)  He has three years of college and training as an Emergency Medical Technician.  (R. at 35,

180.)

### A.    Medical History

Mr. Avery was treated by numerous physicians from 2002 to 2009.  The court has

reviewed Mr. Avery's medical records.  The records most relevant to this decision are discussed

in chronological order below.

2

In February 2002, Dr. Jahan Imani, a neuromuscular disease specialist who had seen Mr. Avery for several years wrote a letter in which he noted that Avery's muscle tension headaches and sleep apnea could be temporarily disabling.  (R. at 236.)  He prescribed a CPAP machine to help with Mr. Avery's sleep apnea.  (*Id.*)  Dr. E. Alan Jeppsen – the doctor who had the most consistent treating relationship with Mr. Avery – observed on July 29, 2002 that Mr. Avery was becoming more active.  He also observed that Mr. Avery was trying too hard to lose weight.  (R. at 470.)  In September 2002, Dr. Karen A. Bossler, an emergency room doctor, treated Mr. Avery for a nail puncture wound.  She noted that Mr. Avery had chronic back pain and tendinitis/arthritis along with several wrist surgeries.  (R. at 345.)  In October 2002, Dr. Allisyn Okawa performed surgery to treat Mr. Avery's wrist pain.  (R. at 343.)

 In May 2003, Dr. Brent L. Clyde performed back surgery on Mr. Avery to alleviate Mr. Avery's back pain.  (R. at 240.)  Dr. Clyde noted that Mr. Avery had a facet joint, a joint in the spine, that was weak and degenerated.  The doctor also noted that Mr. Avery had low back pain, and that sitting was his worst position.  (R. at 243–44.)  In December 2003, Dr. Jeppsen examined Mr. Avery.  Dr. Jeppsen noted that for three months after back surgery, pain relief was successful but symptoms of pain in Mr. Avery's low back and buttocks had returned.  (R. at 447.)

In February 2004, Dr. Jeppsen noted that Mr. Avery had gained ten pounds.  He also noted that Mr. Avery was still in severe pain, and was unable to function.  (R. at 444.)  In May 2004, Dr. Jeppsen examined Mr. Avery again.  He noted that Mr. Avery was morbidly obese and Mr. Avery continued to gain weight.  (R. at 441.)  In December 2004, Dr. Jeppsen concluded that Mr. Avery's back surgery had failed.  Mr. Avery had continued pain because of a degenerative disc, and he had trouble sleeping.  (R. at 433.)

3

In March 2005, Dr. Jeppsen wrote that Mr. Avery had some very good days and very bad days. (R. at 422.) Mr. Avery's temperature and blood pressure are up and he has lost 3 pounds. (*Id.*) In April 2005, Dr. Jeppsen noted that Mr. Avery had not been able to exercise but was continuing to attempt to do stretches. (R. at 412.) Dr. Jeppsen examined Mr. Avery again in July 2005. He diagnosed Mr. Avery with failed back syndrome. He also noted that Mr. Avery had continued severe and debilitating pain. (R. at 438.) In addition, Dr. Jeppsen noted that Mr. Avery had chronic insomnia. Also he had persistent and aggressive weight gain. (*Id.*) In October 2005, Dr. Dana DeWitt, a neurologist, examined Mr. Avery. She observed Mr. Avery had a history of chronic headaches consistent with migraines. (R. at 566.) Dr. DeWitt also noted that Mr. Avery's narcotic medication was likely contributing to rebound headaches. (*Id.*)

In March 2007, Damon Marsh treated Mr. Avery and noted that Mr. Avery had been walking or riding a recumbent bike for the past 4 months. (R. at 908.) In October 2007, a medical history form indicated that Mr. Avery was suffering from knee pain that began when he was running. (R. at 515.)

In April 2008, Dr. Jeppsen examined Mr. Avery again. Dr. Jeppsen noted that Mr. Avery was increasing his activity and doing martial arts training, and riding a bike for a limited time. (R. at 378.) Dorian Wood, a physical therapist, met with Mr. Avery in October 2008. Mr. Wood found that Mr. Avery had difficulty bending at the waist during functional activities; sitting; standing; walking for long periods of time; and sleeping. (R. at 535.)

In April 2009, Dr. Lewis Barton, a state agency physician, reviewed Mr. Avery's medical records and concluded that during the relevant time period of 2002 to 2004, Mr. Avery could perform a range of light work. (R. at 749–58.) In September 2009, Dr. Jeppsen noted that Mr.

Avery was carried from church after a major back spasm.  (R. at 1042.)  In November 2009, Dr. Rox Burkett reviewed Mr. Avery's records and affirmed the decision of Dr. Barton.  (R. at 1050.)

In April 2010, Dr. Jeppsen wrote a medical report regarding Mr. Avery.  In that report, Dr. Jeppsen wrote that Mr. Avery had lower back pain and knee pain.  (R. at 1071.)  Mr. Avery had limited use of his left hand.  (R. at 1073.)  And Mr. Avery had to lie down during the day. (R. at 1071.)  In addition, Mr. Avery could only sit or stand for 30 to 40 minutes and Mr. Avery's pain was severe enough to interfere with the attention and concentration needed to perform simple work tasks.  (R. at 1071–72.)  Dr. Jeppsen further stated that Mr. Avery could not move about or walk effectively.  And he could not walk a block at a reasonable pace on rough or uneven surfaces.  (R. at 1073.)  Dr. Jeppsen noted that if Mr. Avery was working, he would miss more than four days of work per month because of his impairments.  (*Id.*)

      B.    <u>Reports</u>

Mr. Avery's DIB application was supplemented by reports and testimony by Mr. Avery's wife Maria Avery, Mr. Avery himself, and Field Officer D. Jackson.

On February 16, 2009, Mrs. Avery completed a report relating how Mr. Avery's condition limited his activities.  Mrs. Avery reported that Mr. Avery spent most of his time lying down and watching television.  Also, she had to help him put on his shoes and socks.  And she had to help him into the car to run errands because he was incapable of lifting his legs up into the vehicle.  (R. at 182–86.)

On March 2, 2009, Mr. Avery also completed a report regarding his own limitations.  He reported that he had lost three jobs because of health problems.  One employer found out about his wrist surgery and terminated him.  Another employer fired him for absences despite notes

from the doctor excusing those absences.  (R. at 197–206.)  Mr. Avery also reported that he was

most comfortable lying down, and it was difficult to find an employer that would allow him to do

so.  (R. at 219.)

On January 22, 2009, Officer D. Jackson filed a field officer disability report.  (*See* R. at

167–171.)  Officer Jackson noted that Mr. Avery had difficulty sitting down and rising from a

seated position.  Also, Mr. Avery stood up three times during the 90 minute interview, and Mr.

Avery had difficulty putting on his coat at the end of the interview.  (R. at 170–171.)

C.    Testimonial Evidence

The court has reviewed the transcript of the hearing held on May 26, 2011 before Judge

Hartman.  The court highlights a few points from the hearing transcript.

Mr. Avery testified that his last job was basically data entry.  (R. at 35.)  In that job, he

did not perform any lifting or carrying, and he spent most of the day sitting.  (*Id.*)  In another job,

he did quality control.  (R. at 36.)  At that job, he only had to lift about five to ten pounds.  (*Id.*)

He spent about a fourth of the day standing.  (*Id.*)  Mr. Avery was also an admitting registrar at a

hospital.  (*Id.*)  In that job, he was not required to lift or carry significant weight.  (R. at 37.)

Mr. Avery testified that he became unable to work on June 28, 2002 because he "had

back problems, hand problems, wrist problems, and headaches and knee [problems.]"  (R. at 37.)

He testified that during the relevant time period of 2002 to 2004, he could lift 5 to 10 pounds

with his left hand and he could write about one page with that hand.  (R. at 39, 48.)  Mr. Avery

also testified that he had headaches every day for which no treatment helped.  (R. at 40.)  He

spent an hour or two a day reading.  (R. at 42.)  Mr. Avery testified that he fixed quick and easy

meals such as hamburger helper, tacos, and salad.  (R. at 44.)  He also did laundry.  (*Id.*)  He did

6

dishes, but not very often.  (R. at 45.)  He shopped for food about once or twice a month, but

occasionally had to use an electric cart to shop.  (R. at 45.)  He ate out three or four times a

month, but sitting in a restaurant booth was difficult.  (*Id.*)  He went to movies or sporting events

once or twice every six months.  (R. at 45–46.)  He attended church for about an hour once or

twice month, but he had problems sitting and standing.  (R. at 46.)

The vocational expert testified that someone with limitations similar to Mr. Avery's could

perform two of Mr. Avery's three previous jobs.  The exception was data entry clerk because it

would require constant use of Mr. Avery's dominant left hand.  (R. at 49–50.)  In addition, the

vocational expert testified that someone with Mr. Avery's background and limitations could

perform a significant number of jobs in the national economy, such as brake lining coater,

fleecer, and pinker.  (R. at 50.)  But, Mr. Avery would not be able to perform any of these jobs if

he was absent due to impairments more than four times a month or was able to sustain work for

no more than two to three hours of the workday as a result of health limitations.  (R. at 51.)

ANALYSIS

I.    **Standard of Review**

The court reviews the ALJ's decision to determine whether substantial evidence in the

record as a whole supports the factual findings and whether the correct legal standards were

applied.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)  "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

(citation omitted).  "It requires more than a scintilla, but less than a preponderance."  *Id.*  The

court cannot reweigh the evidence or substitute its judgment for that of the administrative law

judge.  *Id.*  The court must "meticulously examine the record in order to determine if the

evidence supporting the agency's decision is substantial, taking into account whatever in the record fairly detracts from its weight." *Hamlin v. Barnhart*, 365 F.3d 1208, 1241 (10th Cir. 2004). But the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax*, 489 F.3d at 1084 (citation omitted).

## II. The ALJ's Decision

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled." *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005). The claimant bears the burden of proof at the first four stages. *Id.* Step One requires the claimant to demonstrate "that he is not presently engaged in substantial gainful activity." *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). At Step Two, the claimant must show "that he has a medically severe impairment or combination of impairments." *Id.* At Step Three, if a claimant can show that his impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits. *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). If a claimant cannot meet a listing at Step Three, the claimant continues to Step Four, which requires the claimant to show "that the impairment or combination of impairments prevents him from performing his past work." *Grogan*, 399 F.3d at 1261. "If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at [S]tep [F]ive to show that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy, given her age, education, and work experience." *Hackett*, 395 F.3d at 1171. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

The ALJ followed this sequential analysis and found that Mr. Avery met Step One because Mr. Avery was not presently engaged in substantially gainful activity.  Next, the ALJ found that Mr. Avery met Step Two because he had a medically severe impairment or combination of impairments.  But the ALJ made a specific finding that headaches would not be among those impairments examined because there was no evidence that treatment medication was inefficacious and that the headaches limited Mr. Avery's ability to do simple tasks.  (R. at 20–21.)

At Step Three, the ALJ first found that no specific listing exists for obesity.  But, while Mr. Avery's weight "in itself is not disabling," his weight combined with his other impairments "significantly limited his ability to do basic work activities."  (R. at 21.)  Second, the ALJ found that Mr. Avery's degenerative disc disease did not meet a listing because there was no medical evidence that Mr. Avery's spine had significant compression, deformity, or displacement.  (R. at 22.)  In addition, the ALJ found no evidence of ongoing "nerve root involvement or motor, sensory, or reflex loss," and no evidence that Mr. Avery could not "ambulate effectively."  (R. at 22.)  Third, the ALJ found that Mr. Avery's left hand de Quervain's did not meet the listing "based upon physical findings documented by the claimant's medical records."  (*Id.*)  Finally, the ALJ found that Mr. Avery's knee impairment did not meet a listing because the medical evidence did not show the "involvement of one major peripheral weight-bearing joint resulting in the inability to ambulate effectively, or involvement of one major peripheral joint in each upper extremity, resulting in inability to perform fine and gross movements effectively."  (R. at 23.)

Having failed to meet a listing at Step Three, the ALJ determined at Step Four that Mr. Avery had the residual functional capacity to perform his past relevant work as a quality control

9

inspector and a hospital admitting clerk.  In the alternative, at Step Five, the ALJ found that Mr. Avery retained sufficient residual functional capacity to perform work in the national economy.

### III.    Mr. Avery's Objections to the ALJ Decision

Mr. Avery makes four arguments on appeal.  First, Mr. Avery argues that the ALJ improperly rejected Dr. Jeppsen's medical opinions.  Second, Mr. Avery argues that the ALJ improperly rejected the opinions of Mr. and Mrs. Avery.  Third, Mr. Avery argues the ALJ improperly conducted the Step Four analysis.  Finally, Mr. Avery argues that the ALJ failed to meet her Step Five burden to identify specific jobs existing in substantial numbers in the national economy that Mr. Avery could perform despite his limitations.  Each of these arguments is addressed below.

### A.    The ALJ Did Not Improperly Reject Dr. Jeppsen's Medical Opinions

First, Mr. Avery argues that Dr. Jeppsen's opinion, as the treating physician, should be entitled to great weight.  Mr. Avery submits that the ALJ must provide specific, legitimate reasons for rejecting Dr. Jeppsen's opinions, but failed to do so.

The Tenth Circuit has found that an "ALJ should generally give more weight to opinions from claimant's treating sources." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citations omitted).  But, "it is an error to give an opinion controlling weight simply because it is the opinion of a treating source [1] if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or [2] if it is inconsistent with the other substantial evidence in the case record." *Id.*  But "even if [the ALJ] determines that the treating physician's opinion is not entitled to controlling weight," the ALJ should determine what weight, if any, to give that opinion. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007).  In making this

10

determination, the ALJ should consider the following:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
> (3) the degree to which the physician's opinion is supported by relevant evidence;
> (4) consistency between the opinion and the record as a whole;
> (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and
> (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quotation omitted).  "Although the ALJ's decision need not include an explicit discussion of each factor . . . the record must reflect that the ALJ considered every factor in the weight calculation."  *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).  Moreover, the ALJ's treatment of a physician's opinion should be read as a whole, and only reversed or remanded if the entire bases for the decision would still result in error.  *Wall v. Astrue*, 561 F.2d 1048, 1069 (10th Cir. 1988).

Here, it is clear from reading the entirety of the ALJ's opinion that she did not give Dr. Jeppsen's medical opinions about the severity of Mr. Avery's claimed limitations controlling weight.  And she made this determination because she found that Dr. Jeppsen's opinions were inconsistent with other substantial evidence in the case record.  For example, Dr. Barton concluded that Mr. Avery suffered from degenerative disc disorder and had some residual pain from this disorder.  But Dr. Barton concluded that Mr. Avery did not have the degree of limitation he complained of to his treating physicians.  (R. at 25.)  Also, Dr. Burke agreed with Dr. Barton's conclusion.  (*Id.*)  In addition, the ALJ determined that Mr. Avery's testimony exaggerated his limitations.  With respect to his hand pain, Mr. Avery admitted that he plays

video games.  With respect to his back pain, Mr. Avery admitted that he engaged in martial arts

training with a sword.  Mr. Avery also admitted that he went to restaurants 3-4 times per month,

though he stated that he had problems sitting in a booth.  He also went to the movies once or

twice every six months.  And the ALJ found that Dr. Jeppsen, himself, admitted that Mr. Avery's

pain report seemed exaggerated.  (R. at 25 (citing R. at 444).)  Dr. Jeppson also admitted, as

noted in Dr. Barton's report, that Mr. Avery's was a little guarded about his activities and

symptoms and Mr. Avery did not exhibit the usual affect associated with his pain complaints.

(R. at 750.)  Because the ALJ found that Dr. Jeppsen's opinions regarding the severity of Mr.

Avery's limitations were inconsistent with other substantial evidence in the record, the ALJ

diminished the weight given to Dr. Jeppsen's opinions.

Having decided not to give Dr. Jeppsen's opinion controlling weight, the ALJ determined

that "Dr. Jeppsen's opinion is [to be] given little weight."  (R. at 25.)  There is substantial

evidence in the record as a whole to conclude that the ALJ considered all six factors in making

this determination.  As to the first and second factors, it is clear that the ALJ considered the

length and extent of Dr. Jeppsen's relationship with Mr. Avery.  For example, the ALJ cites this

relationship as one reason that Dr. Jeppsen might sympathize with Mr. Avery and assist Mr.

Avery in his disability application.  (R. at 26.)  As to the third and fourth factors, the ALJ

considered the extent to which Dr. Jeppsen's opinion was supported by relevant evidence and the

consistency of his opinion with the record as a whole.  For example, she specifically found that

Dr. Jeppsen's opinion "departs substantially from the rest of the evidence of record."  (R. at 26.)

As to the fifth factor, the ALJ considered Dr. Jeppsen's specialty.  For example, the ALJ

considered Dr. Jeppsen's expertise and treatment of Mr. Avery, but concluded that both Dr.

Barton's and Dr. Burkett's opinions were more credible.  Moreover, there is no allegation that

Dr. Jeppsen's relevant expertise exceeded that of Dr. Barton's or Dr. Burkett's.  As to the sixth

factor, the ALJ considered other relevant factors in deciding to give little weight to Dr. Jeppsen's

opinion.  For example, she based her decision, in part, on the testimony of Mr. Avery himself.

The court recognizes that the ALJ erred in finding that Dr. Jeppsen's April 2010 report

contains no description of Mr. Avery's symptoms and limitations in the relevant time period of

2002 to 2004.  Indeed, Dr. Jeppsen's report discusses Mr. Avery's limitations since February

2003.  (R. at 1074.)  In addition, the court recognizes that it is inappropriate for an ALJ to reject a

treating physician simply because "a family doctor naturally advocates his patient's cause."

*Langley v. Barnhart*, 353 F.3d 1116, 1121 (10th Cir. 2004).  These reasons, however, do not

form the entire bases of the ALJ's decision.  And the ALJ's treatment of Dr. Jeppsen's opinion,

when viewed in its entirety, is supported by substantial evidence.

### B.  The ALJ Did Not Improperly Reject Lay Witness Testimony

Mr. Avery argues that the ALJ improperly rejected his own testimony and that of his

wife, Maria Avery.  "In general, the extent to which an individual's statement about symptoms

can be relied upon as probative evidence in determining whether the individual is disabled

depends on the credibility of the statement."  SSR 96-7p.  "Credibility determinations are

peculiarly the province of the finder of fact, and [the court] will not upset such determinations

when supported by substantial evidence."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)

(internal quotation marks omitted).  But "[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Id.* (internal quotation marks omitted).

13

1.   Mr. Avery's Testimony

The ALJ found that Mr. Avery's statements "concerning the intensity, persistence, and limiting effects of [the] symptoms are not credible."  (R. at 24.)  The ALJ set forth two reasons for this finding.

First, the ALJ found discrepancies between Mr. Avery's testimony regarding his limitations and Mr. Avery's activities.  For example, Mr. Avery testified that he had difficulty working with his hands because of pain.  But the ALJ noted he played video games and could write about one page.  (R. at 25, 48.)  Mr. Avery testified that he had back pain.  But the ALJ noted that he engaged in martial arts training with a sword.  (*Id.*)  Also, Mr. Avery testified that he went out to eat at a restaurant 3-4 times per month, though he stated that he had problems sitting in the booth.  Mr. Avery also went to the movie theater once or twice every six months.  The ALJ also noted that Mr. Avery went on vacation even though he claimed to suffer disabling pain.  While a vacation and disability are not necessarily mutually exclusive, Mr. Avery's decision to go on vacation tends to suggest that his symptoms and limitations may have been overstated.  (*Id.*)

Second, the ALJ cited treatment records reflecting that Mr. Avery's pain reports appeared to be exaggerated and that a reason Mr. Avery might have exaggerated his pain was to get narcotics.  For example, Dr. Jeppsen observed that Mr. Avery complained of pain but "smil[ed] often and [did] not see[m] to show usual pain affect."  (R. at 44.)  Dr. Jeppsen also observed that Mr. Avery was "somewhat guarded about his activity and symptoms."  (*Id.*)  Dr. Barton noted that the degree of limitation complained of by Mr. Avery did not comport with the treatment

14

records as a whole.  (*Id.*)  Dr. Jeppsen noted that he suspected Mr. Avery of narcotics seeking

behavior.  And Dr. Jeppsen suspected Mr. Avery had honesty issues.  (R. at 25.)  Dr. Barton also

noted that Mr. Avery would go to several facilities complaining of the same pain.  (R. at 750.)  In

addition, Mr. Avery's treatment records also reflect that he made excuses rather than actively

participate in his own recovery.  (R. at 25.)  Thus, contrary to Mr. Avery's arguments, the ALJ

linked her credibility determinations to specific facts and substantial evidence in the record.

Mr. Avery, however, cites select portions of Dr. Jeppsen's opinion as evidence to suggest

that the ALJ wrongly diminished the credibility of his testimony.  In effect, Mr. Avery is asking

this court to reweigh the evidence already considered by the ALJ.  The Tenth Circuit is clear that

the court "may neither reweigh the evidence nor substitute [its] discretion for that of the [ALJ.]"

*Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).  Thus, the evidence Mr. Avery points

to, even if true, does nothing to undermine the substantial evidence relied upon by the ALJ in

making her credibility determination.  This court must affirm an ALJ's decision where

substantial evidence in the record supports that decision.

2.    Mrs. Avery's Testimony

The ALJ also found that Mrs. Avery's February 2009 report should be entitled to very

little weight for two reasons.  First, the report was offered after the date Mr. Avery was last

insured and did not explicitly reference whether Mrs. Avery's observations and opinions related

to the alleged period of disability or the date the report was submitted.  (R. at 26.)  Second, the

ALJ also noted that Mrs. Avery was not a disinterested and objective third party because she was

Mr. Avery's wife.  (*Id.*); *see also Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)

(holding that an ALJ may properly consider "the motivation of and relationship between the

15

claimant and other witnesses." ).

Mr. Avery, however, argues that these reasons set forth by the ALJ for diminishing the weight of Mrs. Avery's testimony would apply with equal force to all lay witness statements. Therefore, he submits, these are improper grounds for rejection. *See Hopper v. Astrue*, 2011 WL 1311712, *5 (E. D. Okla. Mar. 31, 2011) (finding a problem with the ALJ's reasoning when "it essentially consists of generalized statements that apply to every lay witness opinion"); *see also Spicer. v. Astrue*, 2010 WL 4176313 (M.D. Ala. Oct. 18, 2010) (finding improper the ALJ's credibility determination because the "stated rationale . . . applies with equal force to every lay statement"). However, the ALJ's two reasons for diminishing the credibility of Mrs. Avery's report do not apply to every lay witness statement. For example, not every lay witness statement is subject to the bias of a spousal relationship. And not every lay witness statement will fail to explicitly reference whether it relates to the alleged period of disability. In addition, these reasons for diminishing the credibility of Mrs. Avery's testimony are also supported by the fact that Mrs. Avery's opinion is inconsistent with the medical evidence and Mr. Avery's own testimony. Accordingly, the court must affirm the ALJ's finding that Mrs. Avery's opinion should be entitled to very little weight.

### C.     The ALJ Did Not Improperly Determine That Mr. Avery Had The Capacity to Perform a Past Relevant Job

Mr. Avery argues that the ALJ failed to conduct a proper Step Four analysis. At Step Four an ALJ must make "(1) A finding of fact as to the individual's residual functional capacity (RFC); (2) A finding of fact as to the physical and mental demands of the past job/occupation; (3) A finding of fact that the individual's RFC would permit a return to his or her past job or

occupation." SSR 82–62; *see also Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citing similar framework).  In making a determination under Step Four, the ALJ may rely on the testimony and analysis of the vocational expert.  *Doyal*, 331 F.3d at 761.  Also, the transcript of the hearing, especially the testimony of the vocational expert, may reveal that the ALJ conducted the requisite analysis.  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993).  Moreover, Mr. Avery has the burden at Step Four to establish he is incapable of performing his past relevant work.  *O'Dell v. Shalala*, 44 F.3d 855, 860 (10th Cir. 1994).

As to the first element of the Step Four analysis, Mr. Avery argues that the ALJ improperly rejected the assessment of Mr. Avery's treating doctor, Mr. Avery's own testimony, and Mrs. Avery's report.  For this reason, Mr. Avery contends the RFC does not include all of Mr. Avery's limitations.  As discussed previously, the ALJ made proper determinations limiting the testimony and opinions of all three individuals.  Accordingly, there is substantial evidence to support the ALJ's RFC determination.

As to the second element, Mr. Avery argues that the ALJ failed to make specific findings about the physical and mental demands of Mr. Avery's past relevant work.  But examination of the ALJ's opinion and the hearing transcript reveals that the ALJ made those specific findings. For example, the vocation expert testified that both the quality control inspector and hospital admitting clerk positions were semi-skilled and sedentary.  (R. at 49.)  Mr. Avery testified that, for the quality control inspector position, he had to lift five to ten pounds.  Also, he spent about a fourth of the day standing.  (R. at 36.)  In addition, Mr. Avery testified that, for the hospital admitting clerk position, he did not have to do any significant lifting or carrying.  (R. at 37.)  The ALJ relied on the vocational expert and Mr. Avery's testimony to make findings regarding the

17

physical demands.  To the extent that Mr. Avery argues that there are also mental impairments at issue, he fails to explain those mental impairments.  In fact, Mr. Avery's claims implicate only physical limitations.  Thus, there is substantial evidence in the record to show that the ALJ met the second element of the Step Four analysis.

As to the third element, Mr. Avery argues that the ALJ failed to provide a detailed explanation that Mr. Avery could perform past relevant work.  But there is adequate explanation on the record to support the ALJ's decision that Mr. Avery could perform past relevant work. For example, the ALJ found that Mr. Avery's "residual function capacity allows for the performance of the quality-control inspector position because it is a semi-skilled, sedentary exertional position."  (R. at 26.)  The ALJ also found that Mr. Avery's residual function capacity allows for the performance of the hospital admitting clerk position because it is a semi-skilled, sedentary exertional position."  (*Id.*)

Finally, it is Mr. Avery's burden to establish that he is incapable of performing his past relevant work.  And there is substantial evidence on the record to support the ALJ's conclusion that Mr. Avery has not met his burden.

**D.    The ALJ's Hypothetical at Step Five Was Not Improper**

"If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.  As the court affirmed the ALJ's decision at Step Four that Mr. Avery is not disabled, the ALJ and the court are not required to address Step Five.  In this case, however, the ALJ did so as an alternative basis for finding that Mr. Avery was not disabled.  Mr. Avery contends that the ALJ incorrectly analyzed Step Five.  The court will address Mr. Avery's arguments below.

Mr. Avery argues that the ALJ failed to include a number of Mr. Avery's limitations in the hypothetical posed to the vocational expert as part of the Step Five analysis.  Specifically, Mr. Avery contends that the ALJ failed to include Mr. Avery's severe headaches, his need to lie down several times a day, his inability to stand or sit for more than an hour, and his limitation that he would miss four or more days per month of work because of medical conditions.

The Tenth Circuit has found that "testimony elicited by hypothetical questions that do not relate with precision to all claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). Moreover, it is an "established rule that such inquiries must include all (and only) those impairments borne out by the evidentiary record."  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).  When a ALJ poses a hypothetical question to a vocational expert that includes all the limitations in the ALJ's RFC assessment, the vocational expert's "answer to that question provide[s] a proper basis for the ALJ's disability decision."  *Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000).

Here, the ALJ concluded that Mr. Avery had "the residual functional capacity to perform sedentary work," "except that he was limited to the following:  he could not climb ladders, ropes, or scaffolds; could not balance, kneel, or crawl; could frequently handle or finger with his left hand; could constantly use his right hand; could not use foot controls; and could not work with dangerous unprotected machinery, at unprotected heights, or use vibrating tools."  (R. at 23.) And in accordance with this RFC assessment, the ALJ asked the vocational expert to "assume an individual is restricted to light work, should not climb any ladders, ropes or scaffolds, they should not do any balancing, kneeling or crawling, no use of foot controls, only frequent

handling or fingering with the dominant left hand and constant use of the right, not work with

dangerous unprotected machinery or unprotected heights, and should not use vibrating tools."

(R.  at 50.)  The assumed individual had all (and only) the limitations as described in the ALJ's

RFC assessment.  Therefore, it was proper for the ALJ to rely on the vocational experts

testimony as elicited by her hypothetical question at Step Five.

CONCLUSION

For the reasons stated, the court finds that the ALJ's decision was supported by

substantial evidence and the ALJ committed no legal error.  Accordingly, the court AFFIRMS

the ALJ's decision.

SO ORDERED this 2nd day of December, 2013.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge